# AUGUST GAST v. NORTHERN PACIFIC RAILWAY COMPANY, a Corporation, and Thomas Costello.

### (147 N. W. 793.)

**Damages — collision with train — evidence — contributory negligence.**

1. In an action to recover damages for injuries received in a collision with defendant's train at a public crossing, evidence examined, and *held* that plaintiff was guilty of contributory negligence as a matter of law and that the trial court did not err in so holding.

**Contributory negligence — discovered peril — last clear chance — pleading — excessive speed — crossing — approaching — reasonable care.**

2. Notwithstanding his contributory negligence, plaintiff invokes the rule of discovered peril, or last clear chance. *Held,* that such rule is inapplicable, both under the complaint, which alleges merely specific acts of negligence consisting of excessive speed in approaching the crossing and failure to give suitable warnings, and under the proof, which conclusively shows that the engineer used reasonable care to avoid the accident upon discovering plaintiff's peril.

**Specific acts of negligence — proof on trial — restriction.**

3. Where plaintiff in his complaint alleges merely specific acts of negligence on defendant's part, he will be restricted on the trial to proof of such acts. Had the complaint contained a general allegation of negligence in the operation of the train at the time in question, plaintiff might have relied upon the doctrine of discovered peril, or last clear chance rule if the facts had brought the case within such rule.

Opinion filed May 28, 1914.

Appeal from District Court, Foster County, *Coffey,* J.

From a judgment in defendants' favor, plaintiff appeals.

Affirmed.

*George H. Stillman* and *C. E. Scott,* for appellant.

Where a verdict has been directed for defendant at the close of plaintiff's testimony, the court must construe the testimony most strongly

Note.—The authorities on the applicability of the doctrine of last clear chance where danger not actually discovered are discussed in notes in 55 L.R.A. 418, and 36 L.R.A.(N.S.) 957. And on the question whether wantonness or wilfulness, precluding defense of contributory negligence, may be predicated of the omission of a duty before the discovery of a person in a position of peril on a railroad or street railway track, see note in 21 L.R.A.(N.S.) 427.

in favor of the plaintiff, and assume as true every material fact which plaintiff's testimony tends to prove. Harris-Emery Co. v. Howerton, 154 Iowa, 472, 134 N. W. 1068; Central Trust Co. v. Chicago, R. I. & P. R. Co. 156 Iowa, 104, 135 N. W. 721.

Contributory negligence of plaintiff no bar to a recovery for injuries which defendants could have avoided by the exercise of ordinary care and diligence. Bogan v. Carolina C. R. Co. 55 L.R.A. 418, and note, 129 N. C. 154, 39 S. E. 808; Acton v. Fargo & M. Street R. Co. 20 N. D. 434, 129 N. W. 225; Lathrop v. Fargo-Moorhead Street R. Co. 23 N. D. 246, 136 N. W. 88; Welch v. Fargo & M. Street R. Co. 24 N. D. 463, 140 N. W. 680.

There being a dispute in the testimony as to certain necessary facts to establish negligence and contributory negligence, the case should have been submitted to the jury. Bogan v. Carolina C. R. Co. 129 N. C. 154, 55 L.R.A. 418, 39 S. E. 808 and cases cited; Acton v. Fargo & M. Street R. Co. 20 N. D. 434, 129 N. W. 225; Lathrop v. Fargo-Moorhead Street R. Co. 23 N. D. 246, 136 N. W. 88; Rober v. Northern P. R. Co. 25 N. D. 394, 142 N. W. 22.

The doctrine of last clear chance, being a rule of law, may be urged under a general allegation of negligence. Welch v. Fargo & M. Street R. Co. 24 N. D. 463, 140 N. W. 680.

*Watson & Young* and *E. T. Commy,* for respondents.

Where the undisputed testimony shows that plaintiff was guilty of contributory negligence as a matter of law, the case should be taken from the jury. Hope v. Great Northern R. Co. 19 N. D. 438, 122 N. W. 997; West v. Northern P. R. Co. 13 N. D. 221, 100 N. W. 254; Pendroy v. Great Northern R. Co. 17 N. D. 433, 117 N. W. 535; Garlich v. Northern P. R. Co. 67 C. C. A. 237, 131 Fed. 837; Davis v. Chicago R. I. & P. R. Co. 16 L.R.A.(N.S.) 424, 88 C. C. A. 488, 159 Fed. 10; Kelsay v. Missouri P. R. Co. 129 Mo. 362, 30 S. W. 339; Colorado & S. R. Co. v. Thomas, 33 Colo. 517, 70 L.R.A. 681, 81 Pac. 801, 3 Ann. Cas. 700, 18 Am. Neg. Rep. 316.

The doctrine of last clear chance cannot be urged without any pleading to support it. Hanlon v. Missouri P. R. Co. 104 Mo. 381, 16 S. W. 235; Powers v. Des Moines City R. Co. — Iowa, —, 115 N. W. 494; 6 Thomp. Neg. § 7466; Welch v. Fargo & M. Street R. Co. 24 N. D. 463, 140 N. W. 686; 29 Cyc. 584, ¶¶ II. and III., and authorities

cited, 587; Hall v. Northern P. R. Co. 16 N. D. 60, 111 N. W. 609, 14 Ann. Cas. 960; Hart v. Northern P. R. Co. 196 Fed. 181.

The doctrine of last clear chance has no application to this case. 2 Moore, Facts, § 704; 1 Moore, Facts, §§ 397, 406.

FISK, J.    Plaintiff seeks to recover damages for personal injuries received by him at a public crossing in the village of McHenry, in this state, and also for the loss of one horse and injuries to other horses, through the alleged negligence of the defendant.    The answer puts in issue the allegation of the complaint as to the negligence of the defendant, and alleges that the accident was caused by plaintiff's own negligence.

At the conclusion of the testimony the trial court directed a verdict in defendant's favor, and this appeal is from the judgment entered pursuant to the verdict thus directed.

The assignments of error all relate to the ruling of the court in directing such verdict.

The accident happened about 2 o'clock P. M. on November 24, 1909. Plaintiff, a farmer living some few miles out of town, had hauled a load of grain to the "farmers' elevator," and after depositing his grain in the elevator was in the act of attempting to cross defendant's tracks at such public crossing on his way to the center of the village, when the accident occurred.    The highway at such crossing runs north and south, and is about 150 feet east of the railway depot.    Plaintiff approached such crossing from the north, and his view to the east, the direction from which the defendant's passenger train came, was completely obstructed until he reached a point some 30 or 40 feet from the track.    He was familiar with such crossing, and knew the situation as to obstructions by buildings, etc., having used it many times during the preceding eight years.    He was also familiar with the time such passenger train was due to arrive at McHenry, and had seen it come into town frequently prior thereto, and knew it was about due at the time he attempted to cross the tracks.    He was driving a four-horse team,—one team ahead of the other,—and had a double wagon box or grain tank.    The ground was frozen solid.    We here quote from plaintiff's testimony as follows: "I unloaded the wheat, and drove out, and tied my team on the north side of the elevator, some little distance from

the elevator, and went in and got my checks for the grain, and after I got my checks, drove west up town. I had to go the length of the P. V. elevator, and this elevator and a long addition, west, and the crossing. I could not say as to the exact distance. My best judgment is about 200 feet. While I was in the act of walking from the office to where the team was tied, I listened and heard no sound, I heard no train, or any signals. As soon as I got on the first side track, that is, the side track north of the main track, I saw the danger I was in. I saw the train about 50 or 60 feet, or such a matter. After seeing the train, I pulled back the horses, was struck the instant I pulled. The leaders came quickly back. The pole team was coupled on loose to the end of the pole with two clevices, and the pulling of them back, the pole team pushed onto them with the pole, and they gave a lunge and jumped out of my control. I didn't know anything after that. I don't know whether the engine struck the team or not. I did not hear the bell on the engine ring. I became unconscious." He then narrates his injuries received through the accident, and also the extent of the damage done to his horses, harness, and wagon.

Plaintiff's witness, Ole N. Eide, testified: "I was on the platform in front of the depot in McHenry at the time of this injury and accident. I saw the plaintiff, Gast. I think the train was early that day. I think it was fifteen minutes until one of the trains came in, it was along in that neighborhood. I should judge it was nearly 100 feet from the depot to the crossing. I was about 100 feet west from the crossing. I was looking right at plaintiff coming across the tracks, and at the train. I think the train was between the farmers' and Great Western elevators when the team was coming pretty close to the crossing. From the farmers' elevator to the crossing should judge it would be about 300 feet. I don't know the rate of speed the train was approaching. They were going pretty fast. I suppose the power was shut off some. When the team and train got together, it struck both the pole team and the leaders. Of course the leaders lunged against the end of the tongue, and the tongue broke, and both teams turned to run away, and went down. They turned toward the depot. The nigh horse was killed, and I could not see the other horse. I should say the engine was driven 30 feet after it struck the team. I never measured it. About the length of the wagon and horses I should judge, or a few feet

further. I did not hear the bell ring nor whistle blow. I think the whistle blew, I would not be positive. It was awfully windy, storming and cold. The wind was blowing northwest. I was standing there freezing on the platform. The wind was blowing a pretty good North Dakota wind."

The witness Malmstad testified: "I was on the depot platform in front of the Northern Pacific depot in the village of McHenry at the time of the accident. I was on the east side of the platform, the extreme east end, about 140 feet from the P. V. elevator. I saw the accident. I just went to look towards the Monarch elevator, and saw the team coming from the east going towards the crossing, and the train was right there, and I see they were going to collide together, and the minute the team got on the crossing the engine hit the team right there. The crossing is about 30 to 40 feet from the P. V. coal shed as near as I could judge. As near as I can recall, the train was on this side of the coal shed when Gast's team swung into sight on the way past the tracks. I should judge the engineer could not see the team when they first came past the coal shed. The coal sheds would have obstructed the view of the engineer, but nothing after that. A man has to get past the coal shed before the engineer would be able to see him. It was somewhere around 40 feet from the coal shed to the crossing. After the team swung around the coal shed the engine was on the far side of the coal shed, about 300 feet away. I did not hear or see the whistle or bell ring. I saw no effort to stop the train. I don't know how fast the train was going. The engine moved something over 60 feet after striking the team. When the engine struck the team he had four horses, two in the lead and two on the pole; and as the team come from the north, going south, the lead team was partially across the track and was cut off by the engine right between the leaders and the pole team, and either broke the tongues and chains, anyway the lead team went to the south of the cowcatcher on the engine, and it caught the horses and they got tangled upon the engine, and it drug the pole team and wagon, and the whole thing was drug right off. Something over two rail lengths. The lead team broke away. The pole team stuck right to the engine."

The witness Ruttle, among other things, testified: "I saw the plaintiff on the day of this accident. He had been doing business with my

elevator a few minutes before. Just a few minutes before the train came in I saw him. The train, when first I saw it, was going past the elevator. The train was directly south of the office (of the farmers' elevator). I was standing by the east window of the office. I do not know anything about the speed of the train; only an estimate is all. From my office directly across to the crossing would be about 300 feet. When I first saw the train, my best judgment is that it was going anywhere from 15 to 20 miles an hour. I do not recall whether it whistled or the bell rung at this time. I was attracted more by the rumbling which the rails made, and the building trembling. It jars the building. This office is, I should say, 300 feet from the crossing. I should say the train was going from 15 to 20 miles per hour. I did not see the plaintiff, he was hid by the elevator. I don't know where he was."

The defendant Thomas Costello was called by plaintiff for cross-examination under the statute. He was the engineer on the passenger train, and had been in defendant's employ for about eight years. He described the train as consisting of a combination mail and baggage car, combination smoker and passenger coach with smoking compartment in one end, and a day coach, engine, and tender. He testified that the engine was fully equipped with air brakes, safety appliances, drivers, and tender brake. He says the air brakes were in perfect condition and responded perfectly to operation; that they were the Westinghouse standard brakes, and would throw a pressure of about 70 pounds to the square inch upon the drive and coach wheels. In describing the accident he testified: "I was approaching the crossing at the rate of 10 or 12 miles per hour. The steam was shut off. I shut off the steam down in the yards, about half a mile before I came to the crossing. The train was drifting, sliding in on its momentum. If the brakes were working properly I think I could stop the train at a distance between 150 to 200 feet. I was about 200 feet from the usual stopping place at the time of the accident. I knew where the farmers' elevator was. I usually put on the air brakes just about at that crossing, and apply them lightly and bring the train to a gradual stop. I think that crossing is about 250 or 300 feet from the usual stopping place. I apply a slight pressure, from 5 to 7 pounds. This will bring the train to a gradual stop from within 200 feet. That would be the first application, and the second application would be more to bring the train to a

gradual stop. The additional 63 or 65 pounds pressure would not bring the train to a gradual stop in much less time. You could not get full 70 pounds pressure on the brake. We give 70 pounds pressure, but we don't get that much in braking power. There is not extra or reserved power at all. In an emergency stop you would have full pressure on. In this instance I applied the full emergency pressure as soon as I saw danger in sight, about 80 feet from the crossing. I was at that time nearly opposite the farmers' elevator company's elevator, engine house, and coal shed, and possibly the coal shed near the crossing. I made the emergency application by the brake valve. I turned on the full pressure with this valve. I was sitting on the seat, on the right-hand side of the cab. My hands were probably on the brake valve. I had sand on the engine at the time, but did not use it as I did not have time. There was no time to use sand from the time I saw this danger. I did not try to use it. It occurred to me to use it, but it takes some time to get the sand running, as it runs slow in short time. It takes about six or seven seconds to get it running so the sand would be flowing on the track. It would probably be thirty seconds from the time I pulled the lever up before the sand would get from the sand box to the rail. I obeyed the rules of the company on that occasion. The rules provide for the use of sand if you can. I did not try to use sand, but used all the means possible to make the train stop in that length of time. I can't tell exactly how fast I was going an hour. Was going from 10 to 15 miles. I have made that crossing every day except Sunday. I knew the crossing was there, and always look from the opposite direction to see if there were teams or anything, and took care to have the bell sounding in going over the crossing. I started sounding it upon going into the yard, and kept it going until I stopped at the depot. The bell was ringing from the time I entered the yard, about a half a mile distance. I sounded the whistle at the switch, pretty nearly a half mile east of the crossing. I knew this crossing was between me and the station, and that it was in general use by the public. I cannot see anybody on the street until I get by this coal shed approaching the crossing. I could not see them approach there until right on the sidetrack, owing to the fact that the coal shed shuts off the view. When I first saw the team it was on the side track. The first team, the lead team, was on it. I took hold

of the valve about 80 feet from the crossing. I did not sound the whistle. After we get in sight of the yard we are not supposed to sound the whistle, as there are teams along there, and the whistle would scare them. I would have sounded the whistle if it had done any good. I thought of it, but it would have been foolish to sound the whistle. It would not have done any good. I did not see the team until after they passed the corner. The team was trotting along a pretty fast trot, and the man was urging them along at that. He was shaking the lines. That was after I had applied the emergency stop. The engine traveled about 55 feet after applying the brake, the emergency appliance. I did not hit the man or wagon, but hit the horses. The engine stopped just over the crossing; the tender was just clear of the end of the crossing and about 10 feet of the baggage car. The engine and tender are about 48 feet long. I made the stop in about 150 feet. Stopped the train with a jerk, and the wheels kept on turning."

The witness Niles testified that he had been in the employ of the defendant company for two years as engineer, and three years as fireman, and understood the operation of starting and stopping a passenger train, and gave his opinion as an expert that if "everything was working to the advantage of the engineer, and the equipment was in first-class shape, a class 'C' engine, pulling a train consisting of three cars (such as the train in question) the train traveling at from 10 to 12 miles per hour on a level track with the power shut off sometime before, should make the stop at from 30 to 50 feet without using sand on the rails. If rails are slippery, wet or ice-covered, you would not have the braking power, as if the rails were in good condition. The emergency brake is the brake that is applied with full force, where you make use of all the braking power. The sand is applied as a part of the emergency brake or application. The sand valve should work immediately at full force until the train is all on the sand."

The foregoing is substantially all the testimony offered by plaintiff, in the light of which we are asked to reverse the action of the trial court in granting defendant's motion for a directed verdict. Under the well-settled rule we are to view such testimony in its most favorable light for plaintiff; and we shall assume, for the purposes of this case, that the defendants were guilty of a lack of due care in approaching the crossing in question at the time of the accident, and will consider the

sole question of the alleged contributory negligence of the plaintiff. Viewing the testimony in its most favorable aspect for the plaintiff, can it be said that reasonable men might draw different inferences or conclusions therefrom upon the question of the exercise of due care by the plaintiff? We think not. There is but very little conflict in the testimony, and we think the uncontroverted testimony conclusively discloses not only want of due care on plaintiff's part, but the most wanton and reckless conduct directly contributing to the accident. His own testimony discloses that the only precaution taken by him before attempting to cross defendant's tracks was in listening, while he was walking from the office of the elevator to the place where his team was tied, some distance north, for the approach of a train which he knew was about due; and in so far as the testimony discloses he thereafter untied his team and drove a distance of from 150 to 200 feet over frozen ground to the crossing, without the slightest effort to ascertain whether a train was approaching in close proximity to the crossing. In view of the fact that his vision was completely obstructed, it was his plain duty, before attempting to cross, to listen, and if necessary in order to efficiently exercise his sense of hearing owing to the noise of the wagon and the strong wind which was blowing, to stop before driving upon defendant's track, and his failure to exercise such prudence constituted such negligence as bars his recovery.

See Hope v. Great Northern R. Co. 19 N. D. 438, 122 N. W. 997, which is a case involving facts very similar to those in the case at bar; also Christopherson v. Minneapolis, St. P. & S. Ste. M. R. Co. post, 128, 147 N. W. 791; also West v. Northern P. R. Co. 13 N. D. 221, 100 N. W. 254; Pendroy v. Great Northern R. Co. 17 N. D. 433, 117 N. W. 531.

As stated by the supreme court of Ohio in the recent case of New York, C. & St. L. R. Co. v. Kistler, 66 Ohio St. 326, 64 N. E. 130, 12 Am. Neg. Rep. 343: "To drive upon a crossing without first looking for passing trains is also negligence. The looking should usually be just before going upon the crossing, or so near thereto as to enable the person to get across in safety at the speed he is going before a train within the range of his view of the track, going at the usual speed of fast trains, would reach the crossing. There should be such looking before going upon the track, even though there was a looking farther

away when no train was seen approaching. A train at the usual speed will go quite a distance, while a team on a walk or trot will go a much shorter distance. The care to be taken in such cases should correspond with the danger." Applying this reasoning to the case at bar, it was, we think, clearly plaintiff's duty, owing to the known obstruction to his view, to listen for an approaching train before driving upon the crossing and at such close proximity thereto as to reasonably render such precaution effective.

Indeed, appellant practically concedes that he was guilty of contributory negligence in approaching such crossing; but he argues that such contributory negligence is no bar to his recovery, for the reason, as stated, that defendants, under the doctrine of "last clear chance," might, by the use of due care, have avoided the accident. Appellant cites and relies upon Welch v. Fargo & M. Street R. Co. 24 N. D. 463, 140 N. W. 686, and authorities cited. Also Bogan v. Carolina C. R. Co. 129 N. C. 154, 55 L.R.A. 418, 39 S. E. 808.

As we view it, there are two insurmountable barriers to plaintiff's recovery under the rule of "discovered peril or last clear chance." First, negligence of the defendants in not using reasonable care to avoid injuring the plaintiff after discovering his dangerous situation is not alleged in the complaint. On the contrary, the negligence alleged in the complaint consists of specific acts as follows: ". . . defendants ran one of their locomotives with a train of cars attached, across said highway at said crossing, at a great and negligent rate of speed and without warning of any kind." Having alleged the specific acts of negligence relied upon, it is well settled that plaintiff is restricted in his proof accordingly. Hall v. Northern P. R. Co. 16 N. D. 60, 111 N. W. 609, 14 Ann. Cas. 960; 14 Enc. Pl. & Pr. 342, and numerous cases cited; Hart v. Northern P. R. Co. 196 Fed. 181. The authorities relied upon by appellant are not in point. They are cases involving complaints charging negligence under a general allegation. This court, in line with numerous authorities from other jurisdictions, has adopted the rule in Welch v. Fargo & M. Street R. Co. supra, and the other cases cited therein, that "the doctrine of discovered peril or the last clear chance can be urged under a general allegation of negligence in the complaint;" but our attention has been called to no decision by this court extending such rule to cases like the one at bar where specific

acts of negligence only are pleaded, and no request for an amendment of the complaint was made. Second. But even if the issues were broad enough to permit proof by plaintiff under the doctrine of dis-covered peril, we would have no hestitancy in concluding that plaintiff wholly failed to bring himself within such rule, for, as before stated, he testified: "As soon as I got on the first side track, that is, the side track north of the main track, I saw what danger I was in. I saw the train about *50 or 60 feet* or such a matter. After seeing the train I pulled back the horses, was struck the instant I pulled." Moreover, the undisputed evidence is to the effect that the engineer instantly applied the full emergency brake upon discovering plaintiff's danger, and did everything in his power to stop the train and avert the accident, and we do not think the mere opinion of the so-called expert, Niles, that the train might have been stopped within the space of from 30 to 50 feet, raised a sufficient conflict to make it a question for the jury. Tak-ing the testimony of the plaintiff himself, together with that of the engineer who fixes the distance that he was from the crossing when he first discovered plaintiff's peril, there is no room for the application of the rule of "last clear chance," even if the complaint was broad enough to permit plaintiff to rely on such rule.

Affirmed.

BURKE, J., disqualified.